# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 2:18-cv-2665 |
| SHELBY RESIDENTIAL AND | ) | |
| VOCATIONAL SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Defendant Shelby Residential and Vocational Services, Inc's ("SRVS")

Motion for Summary Judgment, filed on February 28, 2020.  (ECF No. 41.)  Plaintiff Cynthia

Griffin ("Griffin") filed a Response in Opposition on July 6, 2020.  (ECF No. 54.)  Defendant filed

a Reply in Support of its Motion for Summary Judgment on July 20, 2020.  (ECF No. 57.)  For the

following reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.    BACKGROUND

This is an action under 42 U.S.C. § 12117 *et seq.* for discrimination because of disability

in violation of the Americans with Disabilities Act ("ADA"), hostile work environment, and

retaliation.  Plaintiff also claims interference with her rights under Family Medical Leave Act

("FMLA") and asserts a Tennessee state claim for intentional infliction of emotional distress.

(Complaint, ECF No. 1-1.)

### A.  Factual Background

Defendant SRVS is a nonprofit organization that provides support and services to

individuals with disabilities.  (ECF No. 54-2 ¶ 1.)  Plaintiff was hired by Defendant on February

20, 2014 as the Manager of SRVS's Collierville Enhanced Learning Center.  (Id. ¶ 4.)  In June

2015, a position for Director of Children Services became open, and Plaintiff was advised of the

opening.  (Id. ¶ 7.)  Plaintiff was offered the job and accepted it on June 16, 2015.  (Id. ¶ 8.)  As

the Director of Children Services, Plaintiff was tasked with overseeing Pediatric Therapies, Early

Intervention, Early On, and Preschool Programs.  (Id. ¶ 8.)  Plaintiff's responsibilities included

hiring, scheduling, supervising, training, disciplining and evaluating staff and volunteers,

monitoring client activities, as well as grant writing.  (Id. ¶¶ 9–10.)  Plaintiff directly or indirectly

supervised between 30–35 SRVS employees.  (Id. ¶ 9.)  In July 2016, Plaintiff had been granted

FMLA leave and also received a salary raise of $10,000, which was approved by Executive

Director Tyler Hampton ("Hampton") and Director of Program Operations Connie Bowlan

("Bowlan").  (Id. ¶ 11.)

Also in 2016, Defendant's Quality Assurance ("QA") department began implementation

of a tool to improve quality across departments.[1]  (ECF No. 54-2 ¶ 12.)  In August 2016, Plaintiff's

six direct reports were provided with an anonymous survey of eleven questions regarding

Plaintiff's supervision.[2]  (Id. ¶ 14.)  Three exemplary responses are shown below for comparison:

---

[1] Plaintiff disputes this fact by stating that she "denies that the QA Survey was used by SRVS to improve quality across all departments" and that "[i]t was only used to cause problems for Griffin – not for others in other departments or groups."  (ECF No. 54-2, Response to ¶ 12.)  Defendant has provided copies of the QA Survey, as well as a declaration from Connie Bowlan, who states that she oversaw the QA department.  There is no material dispute with respect to the existence of the QA Surveys and their legitimate purpose.  Plaintiff has not provided testimony or evidence in the record to suggest a conspiracy to utilize QA Surveys to cause "problems" for her.
[2] Plaintiff disputes this fact by stating that she "denies the validity of the 'anonymous survey.'"  Defendant has provided copies of the survey, which includes metadata showing when the information was inputted.  The responses to the survey are not materially disputed.

2



#1

**COMPLETE**

| | |
|---|---|
| Collector: | Web Link 1 (Web Link) |
| Started: | Tuesday, August 16, 2016 4:37:17 PM |
| Last Modified: | Tuesday, August 16, 2016 4:38:38 PM |
| Time Spent: | 00:01:21 |
| IP Address: | 107.77.236.211 |

Page 1

**Q1** How likely is it that you would recommend your supervisor to a colleague?

**Extremely likely - 10 (Promoter)**

**Q2** How available to employees is your supervisor?  —  Very available

**Q3** How effective is the training you receive from your supervisor?  —  Very effective

**Q4** How consistently does your supervisor recognize employees for good work?  —  **Extremely consistently**

**Q5** How consistently does your supervisor hold employees accountable for poor performance?  —  **Extremely consistently**

**Q6** How reliable is your supervisor?  —  **Extremely reliable**

**Q7** How effectively does your supervisor use company resources?  —  **Extremely effectively**

**Q8** How professionally does your supervisor behave?  —  Extremely professionally

**Q9** Overall, are you satisfied with your supervisor, neither satisfied nor dissatisfied with him/her, or dissatisfied with him/her?  —  Very satisfied

**Q10** Overall, how effective at his job is your supervisor?  —  **Extremely effective**

**Q11** What does your supervisor need to do to improve his/her performance?

I can't think of anything she isn't already doing. She is amazing.

(ECF No. 57-2 at PageID 614–15.)

# #5

| | |
|---|---|
| Collector: | Web Link 1 (Web Link) |
| Started: | Wednesday, August 17, 2016 2:54:36 PM |
| Last Modified: | Tuesday, August 23, 2016 1:16:07 PM |
| Time Spent: | Over a day |
| IP Address: | 108.194.158.80 |

Page 1

**Q1** How likely is it that you would recommend your supervisor to a colleague?

**2 (Detractor)**

**Q2** How available to employees is your supervisor?     **Not so available**

**Q3** How effective is the training you receive from your supervisor?     **Not so effective**

**Q4** How consistently does your supervisor recognize employees for good work?     **Extremely consistently**

**Q5** How consistently does your supervisor hold employees accountable for poor performance?     **Somewhat consistently**

**Q6** How reliable is your supervisor?     **Not so reliable**

**Q7** How effectively does your supervisor use company resources?     **Very effectively**

**Q8** How professionally does your supervisor behave?     **Not so professionally**

**Q9** Overall, are you satisfied with your supervisor, neither satisfied nor dissatisfied with him/her, or dissatisfied with him/her?     **Somewhat dissatisfied**

**Q10** Overall, how effective at his job is your supervisor?     **Not so effective**

(ECF No. 57-2 at PageID 621.)

**Q11** What does your supervisor need to do to improve his/her performance?

Providing this feedback makes me feel very uncomfortable because I will have to continue to interact with her. I am doing this because it is what is best for SK& F. I have not seen her job description and have no context to tell if she is meeting job expectations. Previously the Director of Children's Services was a 15-hour a week position, so I did not know what duties to expect CL to take over or new ones that would be added since she is full time.

I do have several things that need improvement in her role as my supervisor.

1. presence at work - CL takes off work often for a variety of personal reasons; for example, her close friend had cancer and she accompanied the friend to many of her doctor's appointments. Some days that I am planning to go to SRVS for other purposes, instead of emailing, I plan to see her in person, but have only seen her in her SRVS office since she moved in. Although she often will answer emails and texts on a day she is scheduled to be off, other days that I think she is there, hours go by without an answer. Often her responses come late in the evening when I am no longer at work. Recently, Tyler and Lobelia had questions about budget and addressed them in an email to both of us. I waited about 20 minutes to answer to see if she would reply, but she did not. Emails were exchanged the next two hours, and CL finally replied to something several hours later, I believe after the dinner hour.

We maybe see each other in person 2 times a month. Minor things can be accomplished solely with email and texts but not major issues or planning. I came to her and told her I needed more face time and she agreed to meet with me twice a month starting in June. The first two were canceled and we have met once since.

example - after she had been off for her own health reasons, we had a monthly management team meeting planned for July with many issues to discuss. We were informed that the meeting would be only 30-40 meetings because she had to attend the friend's No Mo Chemo party.

2. Lateness - frequently late for meetings and other events. Examples - Recently was late for a tour scheduled with Karen Dunn and some potential supporters of SRVS. She was also late for our SK & F inservice that had been scheduled for 6 months for a doctor's appointment.

3. Professionalism - speaks too casually or informally to others. Uses nicknames instead of calling certain people by their given name, even in a formal setting. When on tours or at media events, CL tells her personal story about SK& F but does not speak as an educator in professional terms about the benefits of inclusion. Also frequently interrupts work discussions to answer her cell phone for clearly personal calls.

4. Leadership - she has a lack of planning/strategy/problem solving skills - Her focus is reactionary instead of proactive. There is little evidence of a long-term plan to improve services. Even in management meetings the items on the agenda often are smaller issues rather than discussing or planning projects. We have the same few items on the agenda from month to month with no progress

5. Advocacy - she does not advocate for our department. When we bring up issues with SRVS we hear, "it is what it is", "I know, right", or, "that's just how they do things".

6. We are in the middle of another event that is for the whole of SK&F, not just the preschool. One of the big donors to SK&F is coming Thursday to tour all the programs and have a reception. Development approached us with the idea and they are handing some of the details. Outside of coming up with potential dates, there has been no leadership for the planning of this event. She seems to wait for someone else to initiate. There's been no delegation of tasks or planning so that the tasks can be fit into all the things I already do every day. I know I can be kind of bossy and take charge of things pretty easily, but since I've been here at SRVS it is more because I can't trust that anyone else will do anything until the last minute. You can't throw something together at the last minute and expect it to be quality.

Both inservices were similar, as well as our Breakfast with Santa event that is for all the programs. Cleaning out the storage unit, scanning our years and years of old records, are also examples of projects that lack a leader, so nothing gets done or finished.

(ECF No. 57-2 at PageID 621–22.)

On June 17, 2016, Plaintiff notified Defendant that she needed FMLA leave for a condition beginning June 20, 2016. (ECF No. 54-2 ¶ 53.) That same day, Defendant issued the Notice of Eligibility and Rights and Responsibilities, informing Plaintiff that she was eligible to take FMLA leave. (Id.; see also ECF No. 41-4 at PageID 294–95.) Plaintiff's healthcare provider then submitted a Certification of Health Care Provider for Employee's Serious Health Condition ("2016 FMLA Certification"), which indicated that Plaintiff was unable to perform any aspects of her job functions due to migraine without aura and depressive disorder. (ECF No. 54-2 ¶ 54; see also ECF

No. 41-4 at PageID 296–97.)  The 2016 FMLA Certification also indicated that Plaintiff would be incapacitated for a single continuous period from June 16, 2016 to July 10, 2016.  (ECF No. 41-4 at PageID 298.)  Defendant also approved another request for intermittent FMLA leave from July 11, 2016 through June 15, 2017.  (ECF No. 41-4 at PageID 299.)  Plaintiff admits she had no issues getting FMLA leave approved in 2016.  (ECF No. 54-2 ¶ 56.)  On June 22, 2017, Plaintiff's healthcare provider submitted an updated certification ("June 2017 FMLA Certification"), which stated that Plaintiff would be incapacitated from July 1, 2017 to July 1, 2018, and that Plaintiff would only be able to work 8 hours per day, 7 days a week for the following year.[3] (ECF No. 41-4 at PageID 301–304.)  The June 2017 FMLA Certification also provides that Plaintiff would be expected to be incapacitated 1-2 times every 4 to 6 weeks for 8 hours per episode.  (ECF No. 41-4 at PageID 303.)  Plaintiff had no issues getting leave approved in 2017.  (ECF No. 54-2 ¶ 59.)

On July 31, 2017, Director of Human Resources Kytrinia Miller ("Miller") conducted an "exit interview" with Angela Ervin, who was resigning from SRVS.  (ECF No. 54-2 ¶ 15.)  Ervin stated that she was unable to work Plaintiff, who she claimed was never at work, was not accessible, and difficult to communicate with[4].  (Id. ¶ 16.)  In total, eight of Plaintiff's direct reports resigned during the time period that they were supervised by Plaintiff in the Director of Children Services position[5].  (Id. ¶ 17.)  On August 17, 2017 and September 18, 2017, Plaintiff indicated that she would be absent from work on certain days because her sister had been admitted to the hospital.  (Id. ¶¶ 18–19.)

Around this time, on August 25, 2017, Plaintiff also lodged a complaint against Bowlan,

---

[3] Note that Plaintiff suggests that the period of incapacity should have read to be June 1, 2017 to July 1, 2017, and not July 1, 2017 to July 1, 2018.  Plaintiff does not provide evidence to support this.  Furthermore, the certification was submitted on June 22, 2017, which would not line up with Plaintiff's explanation for a clerical error.  Without more, Plaintiff's suggestion that there is a clerical error does not create a material dispute of fact.
[4] Defendant provides this testimony through Miller, but does not provide a declaration from Ervin.  Plaintiff disputes this characterization.
[5] Plaintiff objects that this is irrelevant and not a material fact.

which she sent as an email with the subject line, "Complaint re: Retaliation/Discrimination/Harassment by Connie Bowlan." ("Bowlan Complaint") (Id. ¶ 38.) This email was sent on the same day that Plaintiff was scheduled to have a meeting with Bowlan to discuss the exit interview Miller had received from Plaintiff's former direct report, Ervin. (Id.) Plaintiff's Bowlan Complaint alleged that Bowlan began criticizing and micromanaging her work since the summer of 2016 after she took FMLA; in particular, Plaintiff testified that after receiving FMLA leave, Bowlan required her to accurately track her time and inform Human Resources when taking FMLA. (Id. ¶ 39.) Plaintiff further alleged that Bowlan required that she be more visible to staff and "not work from home when [she] was unable to come into the office." (ECF No. 41-4 at PageID 307.) Plaintiff concluded, "[B]ased on my research and counsel, it is my conclusion that [Bowlan] is discriminating/retaliating against me and the harassment is due to my FMLA." (Id.) In response, Miller confirmed receipt of the complaint and "asked to schedule a meeting with [Plaintiff] and Hampton to discuss." (Id. at PageID 308.) Plaintiff asserts that that Miller never properly investigated the Bowlan Complaint. (ECF No. 54-2 ¶ 35.) Defendant conducted an investigation into the complaint, and had a discussion with Bowlan, but Plaintiff asserts that the "investigation" was not "appropriate, fair, or adequate." (Id. ¶ 36.)

As evidence of harassment, Plaintiff points to a "change in attitude" from Bowlan from "friendly and concerned" to "demeaning" after her second intermittent FMLA leave was approved. (ECF No. 54-2 ¶ 42.) Furthermore, Plaintiff alleges that Bowlan harassed her, including by questioning her on the accuracy of her reporting of hours worked. (Id. ¶ 43.) Plaintiff's Bowlan Complaint also alleged that Plaintiff's predecessor, Stephanie Phillips, resigned because of Bowlan, and that other directors and managers had stated they experienced inconsistencies and lack of support from Bowlan. (Id. ¶¶ 45–46.) However, Plaintiff admits that at no point did

7

Bowlan prevent her from taking FMLA leave or tell her not to do so.  (Id. ¶ 48.)

On September 8, 2017, Plaintiff met with Miller and Hampton to discuss the Bowlan Complaint.  (Id. ¶ 51.)  Following the meeting, Miller and Hampton investigated the issues, discussed them with Bowlan, and requested that Bowlan copy them on future communications regarding questions or conflicts[6].  (Id. ¶ 52.)  Plaintiff further alleged that Bowlan resisted or prevented her from working from home while on FMLA leave.  (Id. ¶ 69.)  No doctor advised Plaintiff on whether she was able to work from home, and her FMLA paperwork indicated that she could not perform any functions of her positions while experiencing an episode.  (Id. ¶¶ 70–71.)  Plaintiff alleges that two employees—Dinah Montague and Trinna Bracey—were able to work from home, but also agrees that neither had medical restrictions that would prevent them from working remotely.  (Id. ¶¶ 71–74.)

On September 19, 2017, Miller sent an invitation to Plaintiff for a meeting to be held on the same day in the afternoon, which Plaintiff asked to be moved to the next day.  (Id. ¶ 20.) Defendant also asserts that Plaintiff left work early and arrived late on September 21, 2017 and September 26, 2017, respectively, which Plaintiff disputes in her deposition testimony.  (Id. ¶ 21.)

Defendant alleges that following the 2017 FMLA Certification, Plaintiff was absent for either a full day or partial day several days in June, July, August, and September, but Plaintiff disputes this accounting.  (Id. ¶ 60.)  On September 21, 2017, Miller requested an updated FMLA certification, which stated in part: "Your current certification states that you may need to be off 1-2 times every 4-6 weeks for 8 hours.  Your requested FMLA days have far exceeded the estimated

---

[6] Note that Plaintiff's dispute is immaterial.  Plaintiff asserts that she "never participated in an investigation" and that "[n]either Miller nor Hampton [had] previously conducted investigations on any EEO-type issues[.]  (ECF No. 54-2 ¶ 52.)  Plaintiff also points to the Section 5.11.1 of the SRVS Policy, which requires the Executive Director to respond within two working days of a complaint.  Here, Hampton and Miller responded on the same day to the complaint.  Plaintiff further asserts that Defendant was under an obligation to render a written decision within ten days following receipt.  (See ECF No. 54-3 at PageID 437.)  No written decision appears to have been provided by Defendant, besides the confirmation of receipt of the original Bowlan Complaint.

amount of sick days that your doctor has indicated.  Would you please have your doctor complete the attached FMLA certification no later than October 6, 2017[?] [*sic*]"  (ECF No. 41-4 at PageID 310.)  On October 2, 2017, Defendant approved Plaintiff's FMLA leave from September 29, 2017 to October 22, 2017.  (ECF No. 54-2 ¶ 65.)  Plaintiff admits that she did not have any issues getting this leave approved.  (Id. ¶ 66.)  On October 19, 2017, Defendant advised Plaintiff that she had been approved for FMLA intermittent leave until June 30, 2018.  (Id. ¶ 67.)  Plaintiff admits that she did not have any issues getting this leave approved.  (Id. ¶ 68.)

On September 26, 2017, Miller met with Plaintiff and issued a warning for Plaintiff's absenteeism and tardiness unrelated to FMLA leave.  (ECF No. 54-2 ¶ 24.)  Based on Plaintiff's disputes of her warning, Miller revised the warning to remove one absence and to show that Plaintiff declined, but did not cancel, a meeting.  (Id. ¶ 25; see also ECF No. 41-4 at PageID 312.)  On September 25, 2017,  Bowlan issued Plaintiff her annual performance evaluation, which included the following scores: one "exceeds job requirements," five "meets job performance," and eight "needs improvement," resulting in an average score of 2.5.  (ECF No. 54-2 ¶¶ 26–27.)

On October 22, 2017, Plaintiff sent an email to Bowlan, Miller, Hampton, and others, stating that she had back pain and was having trouble moving.  (Id. ¶ 28.)  Plaintiff requested to take Monday's and Tuesday's conference calls remotely.  (Id.)  In response, Bowlan stated: "Please continue to rest and heal, we really need you back 100%.  Take care and we hope to see you on Wednesday."  (Id. ¶ 29.)  Defendant asserts that the October 22, 2017 absence was unexcused and unrelated to FMLA, while Plaintiff contends that this was retaliatory because she lodged an internal complaint on August 25, 2017 against Bowlan.  (Id. ¶ 30.)  Plaintiff points to emails showing that Bowlan had been made aware of the complaint against her by at least October 3, 2017.  (Id.)  On October 23, 2017, Defendant terminated Plaintiff's employment.

Plaintiff suffers from other chronic medical conditions, including migraines, irritable bowel syndrome, degenerative disc disease, depression disorder, and GERDS.  (Id. ¶ 75.) Plaintiff's medical conditions require her to remain at home to deal with medically urgent needs, and her FMLA Certifications indicated that she could not perform any job functions during an episode.  (Id. ¶¶ 76–77.)  Plaintiff stated that she is unable to work and was unable to work at the time her employment with Defendant ended in October 2017.  (Id. ¶ 78.)

## II.     Legal Standard

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' for purposes of summary judgment if proof of that fact would establish or refute an essential element of the cause of action or defense." Bruederle v. Louisville Metro Gov't, 687 F.3d 771, 776 (6th Cir. 2012).

"In considering a motion for summary judgment, [the] court construes all reasonable inferences in favor of the non-moving party." Robertson v. Lucas, 753 F.3d 606, 614 (6th Cir. 2014) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact." Mosholder v. Barnhardt, 679 F.3d 443, 448 (6th Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  "Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." Mosholder, 679 F.3d at 448-49; see also Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.  "When the non-moving party fails to make a sufficient showing of an essential element of his case on which he bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." Martinez v. Cracker Barrel Old Country Store, Inc., 703 F.3d

911, 914 (6th Cir. 2013) (quoting <u>Chapman v. UAW Local 1005</u>, 670 F.3d 677, 680 (6th Cir. 2012) (en banc)) (internal quotation marks omitted).

In order to "show that a fact is, or is not, genuinely disputed," a party must do so by "citing to particular parts of materials in the record," "showing that the materials cited do not establish the absence or presence of a genuine dispute," or showing "that an adverse party cannot produce admissible evidence to support the fact." L.R. 56.1(b)(3); <u>Bruederle</u>, 687 F.3d at 776 (alterations in original) (quoting Fed. R. Civ. P. 56(c)(1)); <u>see also</u> <u>Mosholder</u>, 679 F.3d at 448 ("To support its motion, the moving party may show 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting <u>Celotex</u>, 477 U.S. at 325)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" <u>Martinez</u>, 703 F.3d at 914 (alteration in original) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he district court has no 'duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'" <u>Pharos Capital Partners, L.P. v. Deloitte & Touche</u>, 535 F. App'x 522, 523 (6th Cir. 2013) (per curiam) (quoting <u>Tucker v. Tennessee</u>, 539 F.3d 526, 531 (6th Cir. 2008), <u>abrogation recognized by</u> <u>Anderson v. City of Blue Ash</u>, 798 F.3d 338 (6th Cir. 2015)).

The decisive "question is whether 'the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Johnson v. Memphis Light Gas & Water Div.</u>, 777 F.3d 838, 843 (6th Cir. 2015) (quoting <u>Liberty Lobby</u>, 477 U.S. at 251-52). Summary judgment "'shall be entered' against the non-moving party unless affidavits or other evidence 'set forth specific facts showing that there is a genuine issue for trial.'" <u>Rachells v. Cingular Wireless Employee Servs., LLC</u>, No.

1:08CV02815, 2012 WL 3648835, at *2 (N.D. Ohio Aug. 23, 2012) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884 (1990)). "[A] mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving party must present evidence upon which a reasonable jury could find in her favor." Tingle v. Arbors at Hilliard, 692 F.3d 523, 529 (6th Cir. 2012) (quoting Liberty Lobby, 477 U.S. at 251). "[I]n order to withstand a motion for summary judgment, the party opposing the motion must present "affirmative evidence" to support his/her position." Mitchell v. Toledo Hosp., 964 F.2d 577, 584 (6th Cir. 1992) (citing Liberty Lobby, 477 U.S. at 247-254; Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)). "[C]onclusory assertions, unsupported by specific facts made in affidavits opposing a motion for summary judgment, are not sufficient to defeat a motion for summary judgment." Rachells, 2012 WL 3648835, at *2 (quoting Thomas v. Christ Hosp. and Med. Ctr., 328 F.3d 890, 894 (7th Cir. 2003)). Statements contained in an affidavit that are "nothing more than rumors, conclusory allegations and subjective beliefs" are insufficient. See Mitchell, 964 F.2d at 584-85.

## III.    Analysis

Plaintiff alleges that 1) she was discriminated against on the basis of a disability in violation of the ADA ("ADA Discrimination Claim"); 2) she was subjected to a hostile work environment in violation of the ADA ("ADA Hostile Work Environment Claim"); 3) she was retaliated against for engaging in protected activity under the ADA ("ADA Retaliation Claim"); 4) Defendant interfered with her rights under the FMLA ("FMLA Interference Claim"); and 5) Defendant's conduct amounted to an intentional infliction of emotional distress under Tennessee law ("IIED Claim"). The Court addresses each of these in turn.

12

a.  **Americans with Disabilities Act**

"The ADA makes it unlawful for an employer to 'discriminate against a qualified individual on the basis of disability.'"  Keith v. Cnty. of Oakland, 703 F.3d 918, 925 (6th Cir. 2013) (quoting 42 U.S.C. § 12112(a)).  "A person seeking relief under the ADA for termination must establish (1) that [they are] a disabled person within the meaning of the Act, (2) that [they are] qualified to perform the essential functions of [their] job with or without reasonable accommodation, and (3) that [they] suffered an adverse employment decision because of [their] disability."  McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir. 1997) (citing Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1179 (6th Cir. 1996)).[7]  A plaintiff may make this showing "by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision . . . ."  Monette, 90 F.3d at 1178 (citation omitted).[8]

"If there is direct evidence that the plaintiff suffered an adverse employment action because of his or her disability, the plaintiff then 'bears the burden of establishing that he or she is 'disabled' and 'otherwise qualified' for the position despite his or her disability: a) without accommodation from the employer; b) with an alleged "essential" job requirement eliminated; or c) with a proposed reasonable accommodation.'"  Ferrari v. Ford Motor Co., 826 F.3d 885, 891 (6th Cir. 2016) (quoting Monette, 90 F.3d at 1186).  "As defined in the [ADA], an individual is 'otherwise qualified' if he or she can perform the 'essential functions' of the job with or without reasonable accommodation."  Keith, 703 F.3d at 925 (6th Cir. 2013).  "Once the plaintiff has established these elements, the employer 'bear[s] the burden of proving that a challenged job criterion is essential[,

---

[7] In Lewis v. Humboldt Acquisition Corp., 681 F.3d 312 (6th Cir. 2012), the Sixth Circuit abrogated Monette to establish that the plaintiff's disability need only be a but-for cause of the adverse employment decision, rather than the sole cause.  Lewis, 681 F.3d at 315-16.

and therefore a business necessity,] or that a proposed accommodation will impose an undue hardship upon the employer.'" Id. (quoting Monette, 90 F.3d at 1186). See also Wolfe v. U.S. Steel Corp., 567 Fed. Appx. 367, 370-71 (6th Cir. 2014) (citing Monette, 90 F.3d at 1186).

### i. *ADA Discrimination Claim*

Disability discrimination is evaluated under the McDonnell Douglas burden-shifting framework—that is, once a plaintiff makes out a *prima facie* case, the burden shifts to the defendant to provide a non-discriminatory reason for the employment action. Whitfield v. Tennessee, 639 F.3d 253, 259 (6th Cir. 2011) (citing McDonnell Douglas Corp v. Green, 411 U.S. 792, 802–804 (1973)). If the defendant provides a non-discriminatory explanation for the employment action, then the burden shifts back to the plaintiff to show that the explanation is pretextual. Whitfield, 639 F.3d at 259. "To make out a *prima facie* case, a plaintiff must demonstrate that (1) she has a disability, (2) she is 'otherwise qualified' for the position, with or without reasonable accommodation,' (3) she 'suffered an adverse employment decision,' 4) her employer 'knew or had reason to know' of her disability, and 5) she was replaced or her position remained open." Williams v. AT&T Mobility Servs., LLC, 847 F.3d 384, 395 (6th Cir. 2017) (internal citations omitted).

### 1. Plaintiff has not established a *prima facie* case for ADA Discrimination

Defendant does not dispute that Plaintiff can establish a disability under 42 U.S.C. § 12112(a). The first question before the Court is whether Plaintiff is an "otherwise qualified" individual. The ADA defines a "qualified individual" as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "An employee who cannot perform the job's essential functions is not a qualified individual under the ADA." Aston v. Tapco Inter. Corp.,

631 F. App'x 292, 296 (6th Cir. 2015) (citing Hoskins v. Oakland Cnty. Sherriff's Dep't, 227 F.3d

719, 724 (6th Cir. 2000)).  "The ADA does not require employers to accommodate individuals

who cannot perform the most essential functions of their job."  Aston, 631 F. App'x at 296.

Defendant asserts that Plaintiff is not a qualified individual, because she was unable to

complete her duties as the Director of Children Services.  (ECF No. 41-1 at PageID 147.)  At her

deposition, Plaintiff testified as follows in response to questions regarding her ability to work:

> Q:   And as we sit here today, do you believe that you're able to work?
> **A:   I want to believe that I'm able to work, but when it comes down**
> **to it, I'm often unable.**
> Q:   And why are you unable?
> **A:   Due to my medical conditions.**
> Q:   And how long do you believe that you've been unable to work?
> **A:   I never wanted to believe it, but it became apparent in 2017.**

(ECF No. 54-2 ¶ 78; ECF No. 57-1 at PageID 564.)

In addition to Plaintiff's testimony regarding her ability to perform essential work

functions, Defendant points to "Plaintiff's inability to regularly and predictably attend work."

(ECF No. 41-1 at PageID 148.)  The ADA provides that "consideration shall be given to the

employer's judgment as to what functions of a job are essential, and if an employer has prepared

a written description before advertising or interviewing applicants for the job, this description shall

be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8).  Here,

Plaintiff's responsibilities as the Director of Children Services included overseeing the Pediatric

therapies, Early Intervention, Early On, and Preschool programs, as well as "plan[ning] and

direct[ing] all functions of services being delivered including: hiring scheduling, supervising,

training, disciplining, and evaluating staff members and volunteers, [and] monitoring client

activities."  (ECF No. 54-2 ¶¶ 8–9.)  Plaintiff directly or indirectly supervised between 30–35

SRVS employees.  (Id. ¶ 9.)  Defendant also put forth a job description for the Director of SRVS

15

Children Services position, which includes the following tasks:

1. Plans and directs all functions of services being delivered including: hiring, scheduling, supervising, training, disciplining, and evaluating staff and volunteers, monitoring client activities.

2. Works with the SRVS Program Director to ensure smooth operation of services and appropriate levels of funding.

3. Ensures annual budget development and management including adequate funding for all service components and payroll oversight.

4. Administration and supervision of grant and/or designated funds and all related activities for successful funding including ensuring all fundraising activities are planned, coordinated, managed, and supervised.

5. Oversight of state funds (Part C, TEIS, etc.), including compliance with contractual regulations and ongoing interaction with appropriate personnel.

6. In conjunction with the Program Director and SRVS Kids Managers, develops and implements a strategic plan, Path plan, conducts an annual organizational evaluation in collaboration with staff, Board, and consumers.

7. Ensures all licensure, DIDD and DOE, are current and all regulations are followed.  Ensure accurate records for children we serve are maintained according to DOE, DIDD and TEIS.

8. Serves as a liaison with community/statewide groups/agencies, assessing needs for expanded early intervention services, providing information on services, and advocates for disability issues.

9. Prepares reports, proposals, and maintains appropriate and consistent communication with all staff, Directors and donors.

10. Work with SRVS Kids Marketing Director to complete necessary tasks for the following events: Gavion, Plane Pull and Bunny Run. [9]

(ECF No. 41-4 at PageID 293.)

"Although the employer's judgment receives some weight in [the] analysis, it is not the end-all—*especially* when an employee puts forth competing evidence."  Hostettler v. College of

[9] Note that this job description was not utilized until Plaintiff's replacement was hired on December 4, 2017. Nonetheless, the description presents relevant evidence of what the employer perceived the role to entail.

Wooster, 895 F.3d 844, 855 (6th Cir. 2018). Here, Plaintiff has not put forth competing evidence. In fact, she admits that at the very least, her responsibilities included planning and overseeing all functions of services being delivered. (ECF No. 54-2 ¶ 9.) Notably, the Sixth Circuit has stated that a "reasonable accommodation" may include modified work schedules, but that "it does *not* include removing an 'essential function []' from the position, for that is *per se* unreasonable." E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 761 (6th Cir. 2015) (internal citations omitted). In Ford, the Sixth Circuit held that "regular and predictable on-site job attendance [was] an essential function (and a prerequisite to perform other essential functions)" of the job. Id. at 761. The court further noted that "regularly attending work on-site is essential to most jobs, especially the interactive ones…[a]nd in most jobs, especially those involving teamwork and a high level of interactions, the employer will require regular and predictable on-site attendance from all employees (as evidenced by its words, policies, and practices)." Id.

Here, Defendant's personnel policies, job description, and actions all indicate that attendance was an essential function of the Director position. Defendant has further shown that Plaintiff was unable to complete this essential function. For example, Plaintiff's Performance Evaluation, dated September 27, 2017, rates her as "needs improvement" for "Quantity of Work" and includes a comment stating: "CG often works outside of regular business hours without approval and therefore is not always readily available to her staff or office staff when occasions may occur." (ECF No. 41-4 at PageID 313.) The QA surveys provided to Plaintiff's direct reports in 2016 tell a similar story. (See ECF No. 57-2 at PageID 622 ("We maybe see each other in person 2 times a month…Lateness – frequently late for meetings and other events"); see also id. at PageID 624 ("Cyndi Lou could improve on her reliability to show up to scheduled meetings and remain at meeting for adequate time.…It would be helpful if she were more visible and/or had

office hours.").)  Defendant's September 21, 2017 email to Plaintiff requesting a new FMLA

Certification also confirms this narrative; in that email, Miller states: "Your current certification

states that you may need to be off 1-2 times every 4-6 weeks for 8 hours.  Your requested FMLA

days have far exceeded the estimated amount of sick days that your doctor has indicated."  (ECF

No. 41-4 at PageID 310.)  Based on the record before the Court, Defendant was justified in

terminating Plaintiff based on excessive absenteeism and inability to perform the essential

functions of her position, which was not a violation of the ADA.  See, e.g., Ford, 782 F.3d at 761

("[r]egularly attending work on-site is essential to most jobs, especially the interactive ones—

aligns with the text of the ADA").

       Plaintiff responds by asserting that she requested a reasonable accommodation, and that

she "continued her work from home even when on FMLA."  (ECF No. 54-1 at PageID 358.)  As

Defendant points out, however, Plaintiff's FMLA Certifications state that she was unable to

complete any of the tasks for her position, and Plaintiff further admitted that she never asked or

was advised that she was able to work from home while she was experiencing an episode.  (ECF

No. 41-1 at PageID 150.)  There is no other evidence that Plaintiff requested a reasonable

accommodation and was denied such an opportunity.  Employers are "not required to speculate as

to the extent of [an] employee's disability or the employee's need or desire for an accommodation."

Gannt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046–47 (6th Cir. 1998).  To the extent that

Plaintiff's specific request was for the ability to work from home on a regular basis, her medical

certifications said otherwise.  "An employer's determination that a person cannot safely perform

his job functions is objectively reasonable when the employer relies upon a medical opinion that

is itself objectively reasonable."  Michael v. City of Troy Police Dep't, 808 F.3d 304, 307 (6th Cir.

2015).  As summarized by Defendant, "Plaintiff never asked to work from home on a regular basis,

was not permitted to work from home according to her own medical records, and cannot now include such an accommodation with her suggestion that she was able to perform the essential functions of her job." (ECF No. 57 at PageID 552.)

### 2. Even if Plaintiff made out a *prima facie* case, Defendant had a Legitimate, Nondiscriminatory Reason for the Termination

Assuming that Plaintiff established a *prima facie* disability discrimination case, the burden shifts back to Defendant to establish a "non-discriminatory reason for discharging the employee." Smith v. Chrysler Corp., 155 F.3d 799, 805 (6th Cir. 1998). In Lewis, the Sixth Circuit established that a Plaintiff's disability need only be a but-for cause of the adverse employment decision, rather than the sole cause. Lewis, 681 F.3d at 315–16. Defendant argues that "Plaintiff cannot demonstrate the required 'but for' causation between her termination and a disability." (ECF No. 57 at PageID 552.) Specifically, Defendant cites to "Plaintiff's flagrant and habitual attendance issues and inability to properly supervise direct reports as evidenced by repeated complaints[,]" which date back to the August 2016 QA surveys. (ECF No. 41-4 at PageID 152.) The Court finds that the 2016 QA surveys are the most probative and objective evidence of Defendant's rationale for termination. For one, the 2016 QA surveys were done after Plaintiff had already been granted FMLA leave, been promoted to Director, and received a $10,000 salary increase on July 1, 2016. (ECF No. 54-2 ¶ 11.) In other words, they provide a snapshot of the impressions of employees directly reporting to Plaintiff in her role as Director at SRVS.

Plaintiff argues that "everything changed" in June 2017 and that "Plaintiff became very concerned about discrimination," leading her to file the Bowlan Complaint. (ECF No. 54-1 at PageID 360.) Plaintiff's proffered evidence for this is minimal. She asserts that Bowlan once asked her to make a phone call to a third-party company that Plaintiff found unnecessary, that Bowlan once said "what the hell?" to her in a monthly meeting, and once questioned if she really

had worked a 14 hour day.  (See, e.g., ECF No. 57-1.)  Furthermore, she provides a declaration from Allison Renner, who was a direct report to Plaintiff in 2017, which states that "Ms. Bowlan asked very strange questions about Plaintiff."  (ECF No. 54-1 at PageID 361.)  This simply does not establish but-for causation between Plaintiff's termination and her disability.  Furthermore, the 2016 QA surveys and Plaintiff's annual performance evaluation, in which she received a 2.5 out of 5.0, show that Plaintiff had a legitimate, non-discriminatory reason for her termination. Furthermore, Plaintiff cannot establish that this is mere pretext for her disability.

"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."  Chen v. Dow Chemical Co., 580 F.3d 394, 400 (6th Cir. 2009).  To support this contention, Plaintiff argues that she "has offered evidence to the contrary, including emails praising her job performance from Connie Bowlan, a performance evaluation in 2016, a significant promotion to Director (Summer 2016), a significant pay raise in 2016 (at a time Plaintiff was on FMLA), a second evaluation (which was not fair, it did not show a basis to terminate), and a set of events following Plaintiff's submission of complaints about Connie Bowlan in August 2017;…"  (ECF No. 54-1 at PageID 361–62.)

Plaintiff's argument does not logically support her position.  She received praise for her job performance, a promotion, and a pay raise *at a time she was on FMLA* for her disability.  This alone significantly weakens any causal link between her disability and pretext for her termination. Furthermore, Plaintiff's unhappiness with her evaluation or the 2016 QA surveys does not create pretext.  See Hein v. All America Plywood Co., Inc., 232 F.3d 482, 489–90 (6th Cir. 2000) ("A plaintiff who alleges employment discrimination can show pretext by successfully attacking the proffered reason for the adverse employment decision.…Pretext, however, cannot be shown by

20

attacking the decision itself.") (internal citations omitted).  Besides her own contention that the QA surveys "[were] only used to cause problems for Griffin" and "not for others in other departments or groups," (ECF No. 54-2 at PageID 375), Plaintiff has not pointed to any actual *evidence* that the surveys were unreliable or biased in any way.  Similarly, she has not offered any evidence to show that the 2017 evaluation of her was not factually based or was inherently unreliable.  "The soundness of an employer's business judgment, however, may not be questioned as a means of showing pretext."  Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 898 (6th Cir. 1997) (internal citations and quotations omitted).   Accordingly, Defendant has provided a legitimate, non-discriminatory reason for Plaintiff's termination that is not pretextual.  For the reasons stated above, summary judgment is **GRANTED** to Defendant on Plaintiff's ADA Discrimination Claim.

### ii.  ADA Hostile Work Environment Claim

"In order to maintain an action for a hostile work environment under the ADA, the employee must demonstrate that: (1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures."  Trepka v. Board of Educ., 28 F.App'x 455, 461 (6th Cir. 2002).  The standard under which harassment is evaluated is the same across discrimination contexts.  Crawford v. Medina General Hosp., 96 F.3d 830, 834 (6th Cir. 1996).   Specifically, the alleged conduct must be "severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive."  Barrett v. Whirlpool Corp., 556 F.3d 502, 514 (6th Cir. 2009).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory charges[.]"  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  The Supreme Court has "made it clear that conduct must be extreme to amount to a charge in the terms and conditions of employment[.]"  Id. at 788.

In the instant case, Plaintiff has not made any such allegation.  As summarized by Defendant, "Plaintiff complained that Bowlan required Plaintiff to track her FMLA time, had requested that Plaintiff not work from home while on FMLA, had made a vague and ambiguous comment about FMLA, had attended a monthly team management meeting and stated, 'what the hell?', asked Plaintiff to make an unnecessary phone call, asked whether Plaintiff worked a fourteen-hour day, and that other directors and managers had experienced inconsistencies and lack of support from Bowlan."  (ECF No. 41-1 at PageID 154–55.)  These issues are those that arise in the normal course of employment—certainly, tracking time accurately does not appear to amount to "extreme conduct."  In response, Plaintiff has stated that she "will address her retaliation claim, and incorporate therein her claim for hostile environment."  (ECF No. 54-1 at PageID 363.)  ADA hostile work environment claims and ADA retaliation claims are different claims with different legal standards.  Plaintiff has provided no evidence or legal support sufficient to present a case for a hostile work environment claim, and has not rebutted or even addressed Defendant's motion for summary judgment in that regard.  Accordingly, summary judgment is **GRANTED** on Plaintiff's ADA hostile work environment claim.

### iii.  ADA Retaliation Claim

"To make a *prima facie* showing of retaliation under the ADA, plaintiff must show that (1) he engaged in protected activity, (2) the activity was known to the defendant, (3) plaintiff was subject to materially adverse action, and (4) there was causal connection between the protected activity and the adverse action."  Harris v. Metro. Gov't of Nashville & Davidson Cnty., 594 F.3d

476, 485 (6th Cir. 2010).  If this showing is made, "the defendant must articulate a legitimate nonretaliatory reason for its action before the burden shifts back to plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation."  Id. (citing Ladd v. Grand Trunk W.R.R., 552 F.3d 495, 502 (6th Cir. 2009).  Notably, the "burden of persuasion **remains** with the plaintiff throughout."  Id. (emphasis added).  "To prevail on a retaliation claim, a plaintiff must 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'"  Ford, 782 F.3d at 770 (internal citation omitted).  That the activity allegedly being retaliated against was a protected activity covered by the ADA is a key requirement of an ADA retaliation claim.  See Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014) ("The ADA is not, however a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, aiding another who engages in, activity covered by the ADA.").  The ADA provides that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

Plaintiff asserts that her requests for reasonable accommodations were the allegedly protected activity, noting that she "did not ask for much" and "wanted to stay home during an acute episode," "wanted a work schedule limited to 40-hours per week," "was even willing to work seven days a week," and "wanted to attend an out-of-town conference by telephone."  (ECF No. 54-1 at PageID 365.)  However, any evidence that Plaintiff made a request that her schedule be limited to 40 hours per week is notably absent from the record.  Plaintiff also cites to FMLA issues, but admits that she never had any issues obtaining FMLA leave or certifications for such leave. (See, e.g., ECF No. 54-2 ¶¶ 53–59.)  As noted by Defendant, the "only complaint Plaintiff ever

23

made during her employment was the August 25, 2017 document she submitted concerning Bowlan." (ECF No. 41-1 at PageID 158.) The Bowlan Complaint was promptly investigated by HR, and notably had no allegations of discrimination, treatment, or harassment based on an alleged disability. (See ECF No. 41-4 at PageID 307.) Accordingly, Plaintiff's Bowlan Complaint cannot constitute "protected activity" covered by the ADA.

Furthermore, the timing is critical. To establish a causal connection, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). As summarized by Defendant, "Plaintiff fails to note that the day that Plaintiff submitted the [Bowlan Complaint], Plaintiff had been scheduled to meet with Human Resources and Bowlan about performance issues SRVS had received from a former employee." (ECF No. 57 at PageID 557.) This temporal relation is key because it negates any causal link between Plaintiff's Bowlan Complaint and any alleged retaliation against her due to that complaint. The rationale provided for Plaintiff's termination—her absenteeism and inability to supervise direct reports—*already existed and were at issue* before Plaintiff lodged a complaint against Bowlan. Plaintiff "cannot allege discrimination like a protective amulet when faced with the possibility that his preexisting disciplinary problems could lead to his termination." Beard v. AAA of Michigan, F. App'x 447, 451 (6th Cir. 2014); see also Lee v. Cleveland Clinic Found., 676 F. App'x 488, 508 (6th Cir. 2017) ("Proximity means little when an employee levels the accusation in response to potential discipline.")

Accordingly, Plaintiff has failed to set out a *prima facie* case of retaliation because the August 25, 2017 Bowlan Complaint was not protected activity covered by the ADA, and even if it was, Plaintiff has failed to establish that there was a causal connection between such protected

activity and the alleged retaliatory termination.  Plaintiff further asserts that the "purported legitimate, nondiscriminatory reasons have no basis in fact and are merely pretextual" and that "[t]here are sufficient factual issues raised" such that a reasonable juror could find for Plaintiff. (ECF No. 54-1 at PageID 369.)  The Court disagrees.  Defendant has consistently stated and provided evidence in the form of surveys and evaluations dating back to the fall of 2016 to show that there were persistent issues regarding Plaintiff's supervision.  (ECF No. 57 at PageID 558.) Accordingly, there are no factual issues and Plaintiff has not provided anything other than unsupported attorney argument to support her case.  Summary judgment is **GRANTED** to Defendant on Plaintiff's ADA Retaliation Claim.

### b.  Family Medical Leave Act

In her Complaint, Plaintiff alleges a "denial of Plaintiff's FMLA rights."[10]  (ECF No. 1 ¶ 44.)  The FMLA prohibits qualifying employers from interfering with, restraining, or denying the exercise of or the attempt to exercise, any right provided under the FMLA.  29 U.S.C. § 2615(a)(1). To prevail under an interference theory, the employee must establish that: 1) she was an eligible employee; 2) the defendant is an employer; 3) the employee was entitled to leave under the FMLA; 4) the employee gave the employer notice of intention to take leave; and 5) the employer denied the employee FMLA benefits to which she was entitled.  Wysong v. Dow Chemical Co., 503 F.3d 441, 447 (6th Cir. 2007).  Plaintiff's interference allegation fails because she was never denied FMLA leave.  Defendant granted Plaintiff's request for continuous FMLA leave from June 16, 2016 through July 10, 2016 (ECF No. 54-2 ¶ 55), intermittent FMLA leave from July 11, 2016 through June 15, 2017 (ECF No 54-2 ¶ 55), intermittent leave from July 1, 2017 through June 30, 2018 (ECF No. 54-2 ¶ 58), and continuous FMLA leave from September 29, 2017 through October

---

[10] Note that it is unclear that Plaintiff had adequately alleged an FMLA interference or retaliation claim.  Defendant moves for summary judgment out of an abundance of caution.  (ECF No. 41-1 at PageID 158.)

22, 2017 (ECF No. 54-2 ¶ 65). Plaintiff admits that she never had any issues getting FMLA leave approved, and does not respond or address Defendant's motion on FMLA interference. Accordingly, summary judgment is **GRANTED** with respect to Plaintiff's FMLA Interference Claim.

### c. Intentional Infliction of Emotional Distress

A plaintiff asserting intentional infliction of emotional distress must prove three essential elements for a cause of action: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). Here, as argued by Defendant, "Plaintiff has failed to point to any behavior which would come close to the level of meeting such a claim." (ECF No. 41-1 at PageID 161.) Furthermore, Plaintiff has not put forth any evidence or support to show that she has suffered a serious or severe mental injury. Finally, Plaintiff has not responded to or addressed Defendant's arguments in her response. Accordingly, summary judgment is **GRANTED** with respect to Plaintiff's IIED Claim.

## IV.     CONCLUSION

In sum, there exists no genuine dispute of material fact as to whether Defendant violated Plaintiff's rights under the ADA or FMLA, or that Defendant intentionally inflicted emotional distress on Plaintiff. Plaintiff has not produced evidence to demonstrate a genuine dispute of material fact as to any of the issues in this case. Defendant's motion for summary judgment is **GRANTED**.

**SO ORDERED**, this 15th day of June, 2021.

 /s/ Jon P. McCalla
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

26